NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

KIMBERLY LEAH SCARPATI, *Appellant.*

No. 1 CA-CR 22-0274
FILED 10-5-2023

Appeal from the Superior Court in Maricopa County
No.  CR2018-119908-001
The Honorable Laura M. Reckart, Judge (*Ret.*)

**AFFIRMED IN PART, REMANDED IN PART**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Deborah Celeste Kinney
*Counsel for Appellee*

Law Offices of Trent R. Buckallew, PC, Phoenix
By Trent R. Buckallew
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Judge Daniel J. Kiley delivered the decision of the Court, in which Vice Chief Judge Randall M. Howe joined. Judge Jennifer M. Perkins concurred in part and dissented in part.

---

**K I L E Y**, Judge:

**¶1**        Kimberly Scarpati appeals her convictions and sentences for manslaughter, a class two dangerous felony, and endangerment, a class six dangerous felony. For the following reasons, we affirm Scarpati's convictions but reverse her sentences and remand for resentencing.

## FACTS AND PROCEDURAL HISTORY

**¶2**        The charges in this case arise out of a head-on collision between a Chevrolet Silverado pickup truck driven by Scarpati and a Toyota Corolla sedan driven by "Patricia." Patricia died at the scene, while the sedan's passenger, Patricia's 13-year-old grandson "Robert," suffered injuries to his face and left ankle.[1]

**¶3**        Viewed in the requisite light most favorable to sustaining the jury's verdicts, *State v. Thompson*, 252 Ariz. 279, 287, ¶ 2 n.3 (2022), the evidence shows that at around 4:30 p.m. on April 20, 2018, Scarpati met a friend, A.C., and another acquaintance for drinks at BJ's Restaurant and Brewhouse in Peoria. A.C. observed Scarpati consuming alcoholic beverages, although she could not recall later how much Scarpati drank. At about 6:00 p.m., A.C. left to go home. Roughly two hours later, A.C. received a call from Scarpati, who was "loud," "giddy," and "sounded as if she was intoxicated." Scarpati, who was driving her truck, asked A.C. "to go out again" to "keep the party going." A.C. declined Scarpati's offer, instead inviting her to A.C.'s home for some wine. Scarpati accepted A.C.'s offer and asked her to send her address via text message.

**¶4**        A.C. then heard Scarpati exclaim that she had accidentally struck the curb. A.C. replied by asking Scarpati "if she was okay to drive" or should "get an Uber" instead. Within seconds, the phone went

---

[1] We use pseudonyms to protect the victims' identities. Ariz. R. Sup. Ct. 111(i).

"completely silent." A.C. called Scarpati's name but received no response. "[E]ventually," a male voice "came on the line" and told A.C. that Scarpati had been in "a head-on collision."

¶5        That evening, S.D. was riding his motorcycle eastbound on a two-lane stretch of Northern Avenue behind four other eastbound vehicles when he saw, up ahead, the headlights of a westbound truck cross over into the eastbound lane. He then saw "brake lights" and "dust." S.D. pulled over, dismounted, and ran toward the cloud of dust, seeing "[a] lot of vehicle debris," a "mangled" sedan, and a truck "that had spun around in the middle of the road." Running first to the sedan, he saw the driver, whose "head was against the headrest," "bleeding out." Unable to reach the driver because "[t]here was too much sheet metal and debris in the way," S.D. then ran to the truck. He pulled open the passenger door and saw a woman, later identified as Scarpati, lying unresponsive "underneath the steering column on the driver's side of the floorboard." Seeing a cell phone on the floor of the truck, S.D. picked it up and spoke to the person on the other end, who told him Scarpati's name. S.D. then called to Scarpati by name, and she stirred and regained consciousness.

¶6        Patricia died at the scene from blunt force trauma to the torso. Robert sustained injuries to his jaw and left ankle. Subsequent testing showed that Scarpati had a blood alcohol content ("BAC") of 0.187, far above 0.08, the statutory presumption of impairment. *See* A.R.S. § 28-1381(G)(3).

¶7        A grand jury charged Scarpati with one count of manslaughter, a class 2 felony, and one count of endangerment, a class 6 felony. The grand jury further alleged that both offenses were "dangerous" pursuant to A.R.S. §§ 13-105, -704.

¶8        At trial, the State called multiple witnesses, including A.C., S.D., several of the first responders, an accident reconstruction expert, the phlebotomist who drew Scarpati's blood sample for testing, and the forensic scientist who tested the sample. The State did not call Robert to testify. After the State rested and the court denied Scarpati's motion for a directed verdict under Arizona Rule of Criminal Procedure ("Criminal Rule") 20, Scarpati presented the testimony of one of the responding officers and another forensic scientist. Scarpati did not testify.

¶9        The jury found Scarpati guilty of both manslaughter and endangerment. After the presentation of additional evidence during the aggravation phase, the jury found that both offenses were dangerous

because they involved a dangerous instrument, *i.e.*, Scarpati's pickup truck. The jury also found three additional aggravating circumstances: that Scarpati caused physical, emotional, or financial harm; that the offenses involved multiple victims; and, as to the endangerment count, that the victim was a minor.

**¶10**  At sentencing, the superior court noted the aggravating factors found by the jury, made additional findings of aggravating and mitigating factors, and determined that "the aggravating circumstances slightly outweigh[ed] the mitigating circumstances." The court then sentenced Scarpati to aggravated prison terms of 12 years for manslaughter and 3 years for endangerment, to be served concurrently. Scarpati appealed. We have jurisdiction. Ariz. Const. art. 6, § 9; A.R.S. §§ 12-120.21(A)(1), 13-4031, 13-4033(A)(1).

## DISCUSSION

**¶11**  When reviewing a jury's verdict convicting a defendant, we review the facts in the light most favorable to sustaining the verdict, *State v. Payne*, 233 Ariz. 484, 509, ¶ 93 (2013), and we will resolve all conflicts in the evidence against the defendant, *State v. Guerra*, 161 Ariz. 289, 293 (1989). We review the trial judge's evidentiary rulings for an abuse of discretion. *Payne*, 233 Ariz. at 502, ¶ 49.

**¶12**  As charged in this case, a person commits manslaughter by "[r]ecklessly causing the death of another person," A.R.S. § 13-1103(A)(1), and endangerment by "recklessly endangering another person with a substantial risk of imminent death or physical injury," A.R.S. § 13-1201(A). Voluntary intoxication is not a defense to a criminal act, nor can it be used as evidence that the defendant lacked the requisite culpable state of mind. A.R.S. § 13-503.

**¶13**  An offense is "dangerous" if it "involve[s] the discharge, use or threatening exhibition of a deadly weapon or dangerous instrument or the intentional or knowing infliction of serious physical injury on another person." A.R.S. § 13-105(13). A "dangerous instrument," in turn, "means anything that under the circumstances in which it is used, attempted to be used or threatened to be used is readily capable of causing death or serious physical injury." A.R.S. § 13-105(12).

**¶14**  The range of sentence applicable to a felony is enhanced if the jury determines that the offense is dangerous. *See* A.R.S. § 13-704. If the defendant has no prior felony convictions, a defendant convicted of a class 2 nondangerous felony faces a sentencing range of 3 to 12.5 years in prison,

4

with a presumptive sentence of 5 years. A.R.S. § 13-702(D). A determination of dangerousness, however, enhances the sentencing range to 7 to 21 years, with a presumptive sentence of 10.5 years. A.R.S. § 13-704(A). Likewise, a defendant with no prior felony convictions who is convicted of a nondangerous class 6 felony faces a range of sentence from 0.33 to 2 years, with a presumptive sentence of 1 year. A.R.S. § 13-702(D). A determination of dangerousness, however, enhances that sentencing range from 1.5 to 3 years, with a presumptive sentence of 2.25 years. A.R.S. § 13-704(A).

## I.    Trial Issues

### A.    Proposed Written Juror Questionnaire

¶15    Before trial, Scarpati submitted a 16-page juror questionnaire to the court, asking that it be used during jury selection. The extensive questionnaire included questions not only about the prospective jurors' prior jury service, attitudes toward the legal system, and experiences with motor vehicle collisions, but also about their ethnicity, political affiliation, favorite websites, and the occupations and educational backgrounds of their children and grandchildren. The court denied Scarpati's request to use her proposed questionnaire. Scarpati now argues that the superior court erred in refusing to use her proposed questionnaire, reasoning that, as a result of "recent amendments" to applicable court rules, use of "written jury questionnaires should be the rule, not the exception."

¶16    Criminal Rule 18.5(c) provides that,

> [u]nless the court orders otherwise, the court *should* require each prospective juror to complete a case-specific written questionnaire in a manner and form approved by the court. The written questionnaire should include questions about the prospective juror's qualifications to serve in the case, any hardships that would prevent the prospective juror from serving, and whether the prospective juror could render a fair and impartial verdict.

(Emphasis added.) The comment to the rule states in part that, "[t]o allow the process of challenging jurors for cause to work effectively," the rule "encourages the use of case-specific questionnaires during voir dire where feasible, deferring to the court on the method and manner of their administration." Ariz. R. Crim. P. 18.5(c) cmt. (2022).

¶17    The text of Criminal Rule 18.5(c) and the comment to the rule make clear that the rule *encourages* but does not *mandate* the use of written

jury questionnaires. *See* A.R.S. § 1-213 ("Words and phrases shall be construed according to the common and approved use of the language."); *see also State v. Byers*, 875 S.E.2d 306, 318 n.22 (W. Va. 2022) ("[T]he word 'should,' in most contexts, is precatory, not mandatory.") (citation omitted). Moreover, the rule refers only to the use of "case-specific" questionnaires, and most of the questions included in Scarpati's proposed questionnaire were not case-specific. Indeed, many of the proposed questions were both of a highly personal nature and unlikely to elicit any information that could possibly provide a valid basis to challenge a prospective juror for cause.

¶18        To prevail on a challenge to the manner in which trial jurors were selected, the defendant "must demonstrate not only that the voir dire examination was inadequate, but also that, as a result of the inadequate questioning, the jury selected was not fair, unbiased, and impartial." *State v. Naranjo*, 234 Ariz. 233, 241, ¶ 24 (2014) (citation omitted). Here, the court verbally questioned prospective jurors extensively about their qualifications to serve, any hardships that might prevent them from service, and whether they could render a fair and impartial verdict. The court then allowed the prosecution and Scarpati's counsel an opportunity to verbally question prospective jurors. The court did not restrict Scarpati's scope of inquiry when verbally questioning the jurors, and in her briefing on appeal, she identifies no area of inquiry that she was purportedly unable to adequately explore due to the failure to use her proposed written questionnaire. Further, Scarpati has not demonstrated, or even alleged, that the jurors who were seated were not fair and impartial. We therefore find that the court's rejection of Scarpati's proposed written jury questionnaire entitles Scarpati to no relief.

### B.    Paramedic's Testimony

¶19        During the direct examination of Beau Bandura, a paramedic who responded to the crash scene, the prosecutor asked whether Scarpati "[made] any statements to [him] that she had been drinking that night." The court overruled Scarpati's objection, and Bandura answered, "Yes." Bandura further testified that he smelled "a very strong odor of alcohol" on Scarpati's person and that he administered no medications to her "because of the strong suspicion" she was "intoxicated."

¶20        Citing Arizona's physician-patient privilege, Scarpati argues that the court erred in allowing the State to elicit this testimony from the paramedic. She acknowledges that "Arizona does not explicitly recognize a medical privilege of confidentiality involving [p]aramedics" but asserts that "such a privilege should be found as a natural extension of the doctor-

patient privilege." We review whether a statutory privilege applies *de novo*. *State v. Zeitner*, 244 Ariz. 217, 221, ¶ 15 (App. 2018).

**¶21**     Arizona's physician-patient privilege provides that, without the patient's consent, a "physician or surgeon" cannot be examined as a witness "as to any information acquired in attending the patient which was necessary to enable the physician or surgeon to prescribe or act for the patient." A.R.S. § 13-4062(4). "It has never been an absolute privilege, and it must be strictly construed." *Johnson v. O'Connor*, 235 Ariz. 85, 92, ¶ 29 (App. 2014). We must, therefore, construe the scope of the privilege in accordance with the statute's express terms.

**¶22**     By its terms, A.R.S. § 13-4062(4) applies only to communications to a physician or surgeon. *See also State v. Morales*, 170 Ariz. 360, 363 (App. 1991) ("In order for the [physician-patient] privilege to apply, . . . the witness must be a physician or surgeon.") (citation omitted). Because Bandura was a paramedic, not a physician or surgeon, Section 13-4062(4) does not apply. And although Scarpati urges us to "extend[]" Section 13-4062(4)'s scope to include paramedics, we cannot expand a statute's scope by judicial fiat. *See Roman Cath. Diocese of Phx. v. Superior Court*, 204 Ariz. 225, 229-31, ¶¶ 9, 13, 17 (App. 2003) (holding statutory amendment that "expands the attorney-client privilege" in civil cases inapplicable to criminal cases because the "amendment expressly applies only to civil cases," reasoning that because the "amendment addresses only civil cases[,] [w]e will not assume that the Legislature meant anything other than what it said"); *see also Rogers v. State*, 255 P.3d 1264, 1267 (Nev. 2011) (holding that DUI arrestee's statements to emergency medical technician (EMT) following motor vehicle accident were not protected by statutory doctor-patient privilege because "the Legislature has not included EMTs or paramedics in [the statutory] definition of 'doctor'").

**¶23**     In any event, even if the court erred in overruling Scarpati's objection to Bandura's testimony, any such error was harmless. *See State v. Davolt*, 207 Ariz. 191, 209, ¶ 64 (2004) ("We assess the erroneous admission of evidence for harmless error."). The State presented ample evidence of Scarpati's intoxication, including A.C.'s testimony about Scarpati's alcohol consumption that evening; the call she later received from Scarpati; and the phlebotomist's testimony that, when he drew the blood sample from Scarpati roughly two hours after the collision, he detected "a moderate smell [of alcohol] coming from her." Moreover, subsequent testing showed that Scarpati had a BAC of 0.187. Any error in overruling Scarpati's objection to Bandura's brief testimony about his encounter with Scarpati at the scene was, therefore, harmless.

## C.     Robert's Statements at the Crash Scene

**¶24**         At trial, Peoria Police Detective Tomoki Sheideman testified that when he spoke with Robert at the crash scene, Robert complained of pain in his jaw and left ankle. Scarpati objected to the testimony on hearsay grounds and moved to strike it. Finding Robert's statements admissible under the "excited utterance" objection to the hearsay rule, the court denied her motion to strike. When the State later offered the detective's bodycam videorecording of his conversation with Robert, Scarpati objected on grounds of both hearsay and that its admission "would be a violation of confrontation rights." The court overruled her objection, and the recording was played for the jury.

**¶25**         Scarpati argues that the superior court erred by admitting Robert's statements at the crash scene, asserting that, because Robert did not testify, the admission of his statements to Scheideman violated her right under the Sixth Amendment to the United States Constitution to confront witnesses against her. Although an appellate court "ordinarily review[s] a trial court's ruling on the admissibility of evidence for an abuse of discretion," it reviews "challenges to admissibility under the Confrontation Clause" *de novo*. *State v. King*, 213 Ariz. 632, 636, ¶ 15 (App. 2006) (citation omitted).

**¶26**         The Confrontation Clause of the United States Constitution guarantees criminal defendants the right to confront witnesses against them. U.S. Const. amend. VI. The Confrontation Clause only applies, however, to testimonial statements. *State v. Alvarez*, 213 Ariz. 467, 470, ¶ 10 (App. 2006). Statements are nontestimonial when made to assist police in addressing an ongoing emergency rather than to aid in prosecution. *Id.* at ¶¶ 11-12; *see also State v. Hill*, 236 Ariz. 162, 165, ¶ 12 (App. 2014) (noting that statements "are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution") (citation omitted).

**¶27**         Because Scarpati objected only on hearsay grounds to Sheideman's testimony about Robert's statements, she has waived the constitutional objection to that testimony she now raises on appeal. *See Alvarez*, 213 Ariz. at 469, ¶ 7 ("A 'hearsay' objection does not preserve for appellate review a claim that admission of the evidence violated the Confrontation Clause."). Scarpati is therefore entitled to no relief on her challenge to Sheideman's testimony.

¶28         Nor is Scarpati entitled to relief on her challenge to the admission of the bodycam videorecording. The recording shows Robert sitting on the ground answering Sheideman's questions about his injuries before Sheideman tells him, "I'll get the fire department to check you out" and "try not to move that leg." As the recording makes clear, the detective's questions were not investigatory in nature but were asked for the purpose of determining the medical condition of one who was involved in a serious motor vehicle collision. *See id.* at 473, ¶¶ 19-20 (holding that admission of robbery victim's statements to responding officer about his injuries did not violate Confrontation Clause, reasoning, "[a]lthough the [defendant's] criminal activity that resulted in [victim's] injuries . . . had ended, the [resulting] emergency . . . was very much ongoing" when officer questioned victim). Further, Robert's statements as heard in the recording duplicated Sheideman's testimony about those statements, and Scarpati failed to preserve her objection to that testimony. We therefore reject Scarpati's challenge to the admission of the recording of Robert's conversation with Sheideman.

## D.    Purported "Learned Treatise"

¶29         During cross-examination of accident reconstructionist Jeffrey Eccles, Scarpati sought leave to read into the record portions of a volume entitled *The Handbook of Collision Reconstruction* (2d ed.) by Professor John Kwasnoski and a volume entitled *Scientific Evidence, Volume II* (5th ed.) by Professor Edward Imwinkelried and other co-authors. After the presentation of evidence and argument outside the presence of the jury, the court granted Scarpati leave to read portions of the Kwasnoski volume into the record. After Eccles testified that he was not familiar with the Imwinkelried volume, however, the court precluded Scarpati from reading from it. The court expressly found that the Imwinkelried volume was not a treatise upon which "experts would rely in formulating their opinion in accident reconstruction or collision reconstruction" but instead was written for use by "lawyers and judges" when addressing "evidentiary issues." The court also cited case law for the proposition that "[t]he trial judge determines the degree of probative value of evidence offered under [Arizona Rule of Evidence] 803(18) in order to exclude evidence which is only of slight probative value." *See State v. Jensen*, 153 Ariz. 171, 181 (1987).

¶30         Despite being given leave to do so, Scarpati did not read from the Kwasnoski volume at trial. She argues on appeal, however, that the court abused its discretion in precluding her from reading from the Imwinkelried volume. We review the superior court's ruling on

admissibility of evidence for an abuse of discretion. *State v. Slover*, 220 Ariz. 239, 244, ¶ 15 (App. 2009).

**¶31**     Though hearsay, the contents of a learned treatise, periodical, or other publication may be admissible at trial if the evidence meets the requirements of Arizona Rule of Evidence ("Evidence Rule") 803(18), the "learned treatise" exception to the hearsay rule. To be admissible under this exception, the evidence must be established as a reliable authority either through expert testimony or by judicial notice. Ariz. R. Evid. 803(18)(B). To be admissible under Evidence Rule 803(18), the evidence must come from "a source that experts could rely upon in forming their opinions." *Jensen*, 153 Ariz. at 181 (citation omitted).

**¶32**     Even if a treatise satisfies the requirements of Evidence Rule 803(18), it "must still meet the tests of probative value demanded of any evidence." *Chapman v. Levi-Strauss*, 145 Ariz. 411, 413 (App. 1985). And even relevant evidence may be excluded if its probative value is "substantially outweighed" by the risk of unfair prejudice, the potential to confuse or mislead the jury, or the potential to waste time. Ariz. R. Evid. 403.

**¶33**     Here, the court found that the Imwinkelried volume did not meet the requirements of Evidence Rule 803(18) because it was designed for use by litigators and judges rather than accident reconstruction experts. The court further found that the probative value of the Imwinkelried volume was slight, a finding Scarpati does not challenge on appeal.

**¶34**     Moreover, apart from her cursory assertion that she intended to read from the Imwinkelried volume when questioning Eccles about the "gouge marks" in the road he used to determine the point of impact, Scarpati does not explain the substance of the portion of the Imwinkelried volume that she sought to read to the jury. Nor does she explain why she could not have presented the same information by reading from the Kwasnoski volume; after all, as Scarpati's counsel acknowledged at trial, "the Kwasnoski book," like the Imwinkelried volume, "also talks about the gouge marks." We find that Scarpati has failed to establish that she was prejudiced by the court's ruling allowing her to read from the Kwasnoski volume but precluding her from reading from the Imwinkelried volume during her cross-examination of Eccles. *See John C. Lincoln Hosp. & Health Corp. v. Maricopa County*, 208 Ariz. 532, 543, ¶ 33 (App. 2004) (noting that appellant challenging evidentiary ruling must show "a clear abuse [of discretion] or legal error and resulting prejudice").

### E.     Sufficiency of Evidence

**¶35**          Scarpati next argues that the State presented insufficient evidence to support her convictions and, therefore, the superior court erred by denying her motion for a directed verdict under Criminal Rule 20. Scarpati notes, for example, that the surviving victim, Robert, never testified at trial; A.C., the only eyewitness to Scarpati's alcohol consumption that evening, admitted she could not recall "the amount of alcohol" Scarpati consumed; and S.D. acknowledged that he did not witness the actual collision between the vehicles.

**¶36**          A motion for a directed verdict should be granted only "if there is no substantial evidence to support a conviction." Ariz. R. Crim. P. 20(a)(1). "Substantial evidence" is "such proof that reasonable persons could accept as adequate and sufficient to support a conclusion of [the] defendant's guilt beyond a reasonable doubt." *State v. Rios*, 255 Ariz. 124, 130, ¶ 20 (App. 2023) (citation omitted). "[W]here reasonable minds may differ on inferences drawn from the facts," however, the motion must be denied. *Id.* (cleaned up). We review the denial of a motion for a directed verdict under Criminal Rule 20 *de novo*, viewing the evidence in the light most favorable to upholding the jury's verdict. *State v. Allen*, 253 Ariz. 306, 335, ¶ 69 (2022).

**¶37**          Here, it can hardly be said that the State presented no substantial evidence to support Scarpati's convictions. Ample evidence of Scarpati's impairment while driving was presented, including, *inter alia*, A.C.'s testimony about Scarpati's alcohol consumption and the call she later received from Scarpati, the phlebotomist's testimony about his observations when he drew the blood sample from Scarpati that night, and the testing showing that Scarpati had a BAC of 0.187.

**¶38**          Scarpati argues that the evidence of her BAC was unreliable in view of irregularities "that plagued the test run." As Scarpati correctly notes, Chris Laurel, the forensic scientist who tested Scarpati's blood sample, acknowledged that he observed "a blip" or anomaly in one of the control vials indicating that the vial, which was supposed to contain only alcohol and water, also contained acetaldehyde. Acetaldehyde, he explained, "is biological breakdown" that occurs as "the body . . . metabolize[s]" ethanol. Although "it's quite common" to detect acetaldehyde when "testing whole blood," Laurel stated, he "wouldn't expect acetaldehyde to show up in a control" sample. He later qualified his testimony, stating that he was "not convinced" that the anomaly was, in fact, acetaldehyde. Laurel further testified that the anomaly in the control

vial "wasn't impacting the test results" because "all of the other quality assurance measures" he completed indicated that the test results were "accurate," and the test results from the two samples of Scarpati's blood were consistent with each other.

**¶39**        Although Jon Copeland, the independent forensic scientist called as a defense witness, testified that the presence of the anomaly invalidated the results of the testing of Scarpati's blood, he also admitted that he could not determine "the impact of" the anomaly and that the other testing controls "met the accuracy criteria." In any event, the court could not properly make credibility determinations or weigh the testimony of the two forensic scientists when ruling on Scarpati's motion for a directed verdict. *See State v. West*, 226 Ariz. 559, 563, ¶ 18 (2011) ("[I]n ruling on a [Criminal] Rule 20 motion, . . . a trial court may not re-weigh the facts or disregard inferences that might reasonably be drawn from the evidence."). Instead, "the trial judge must review the evidence in the light most favorable to the state, and all reasonable inferences are to be resolved against the defendant." *State v. Fischer*, 242 Ariz. 44, 49, ¶ 17 (2017) (cleaned up). Laurel's testimony, if accepted by the jury, established that Scarpati's BAC far exceeded the level at which impairment is presumed.

**¶40**        Moreover, ample evidence showed that Scarpati caused the collision by crossing over into the lane of oncoming traffic. S.D. testified that, as he drove eastbound on Northern Avenue, he saw the oncoming headlights of a westbound truck cross over to the eastbound lane. Eccles, the accident reconstructionist, testified that he observed "gouge marks" at the scene "very close to the middle of the eastbound traffic lane of Northern Avenue." Such "gouge marks," he explained, may be created in a head-on collision at the "area of impact" where "both vehicles are pushing down on one another." Eccles further testified that the bulk of the debris from the vehicles was "centered within that eastbound lane," further indicating that the vehicles collided within the eastbound lane of traffic. Eccles also testified that he observed "no pre-impact skid marks" in the road that appeared to have come from the truck but saw "[o]ne tire skid mark that appeared to be" a "pre-collision skid mark" from "the right front tire of the Toyota Corolla." The location of the skid mark, he testified, indicated that the driver of the Toyota "saw the impending impact" and turned to try to avoid it.

**¶41**        Finally, the evidence was undisputed that Patricia died at the scene and that Robert sustained injuries to his face and left ankle. Taken together, the evidence was more than sufficient to support a finding that Scarpati recklessly caused Patricia's death and recklessly endangered

Robert. Robert's failure to testify at trial does not undermine the sufficiency of the evidence. Up until the collision, he was asleep in his grandmother's car, and so would have had little to no relevant information to provide about the collision. The superior court did not abuse its discretion in denying Scarpati's motion for a directed verdict under Criminal Rule 20.

## F. Bifurcation of Guilt and Aggravation Phases of Trial

**¶42** After the jurors returned guilty verdicts, the aggravation phase of the trial began, and the parties were given an opportunity to present additional evidence on the aggravating circumstances that the State alleged. After deliberating, the jurors found that the State had met its burden of proving the aggravating circumstances beyond a reasonable doubt.

**¶43** Scarpati now argues that "the bifurcation of the trial" violated her constitutional right to be free from double jeopardy. After the State "obtain[ed] a guilty verdict" for manslaughter and endangerment as nondangerous offenses, Scarpati argues, the State's use of evidence of "the same conduct in a second proceeding" to secure "another verdict for dangerous offenses" under "the guise of an 'Aggravation Hearing'" amounted to double jeopardy in violation of her constitutional rights. We review "constitutional issues and purely legal issues de novo." *State v. Moore*, 222 Ariz. 1, 12, ¶ 51 (2009).

**¶44** The dangerousness of an offense for sentencing enhancement purposes must "be either admitted by the defendant or found by the trier of fact." *State v. McCray*, 218 Ariz. 252, 257, ¶ 19 (2008); *see also* A.R.S. § 13-704(L) ("The [enhanced] penalties prescribed by this section shall be substituted for the penalties otherwise authorized by law . . . if an allegation of dangerous offense is charged in the indictment or information and admitted or found by the trier of fact."). Under Criminal Rule 19.1(c)(2), however, whether the offense is dangerous for sentencing enhancement purposes "should not be considered by the jury during the guilt phase of trial." *State v. Larin*, 233 Ariz. 202, 211, ¶ 34 (App. 2013). Bifurcating the guilt and aggravating phases of a trial serves to protect defendants from unfair prejudice by "prevent[ing]" juries "from considering inadmissible propensity evidence during the guilt phase of trial." *Id.*

**¶45** Scarpati cites no authority for her argument that bifurcating the guilt and aggravation phases of a trial runs afoul of the constitutional prohibition on double jeopardy, and we are aware of none. Indeed, this Court has already held otherwise in *Barnes v. Bernini*, 245 Ariz. 185 (App.

2018). In *Barnes*, the superior court discharged the jury after it found the defendant guilty of negligent homicide but made no determination of the dangerousness of the offense. *Id.* at 188, ¶¶ 5-7. When the State asked the court to empanel another jury to consider the dangerousness allegation, the defendant objected, arguing that a second trial on the dangerousness allegation would violate his right against double jeopardy. *Id.* at 189, ¶ 10. On appeal, we rejected the defendant's argument, finding that the prohibition against double jeopardy was not implicated because the defendant had not been "acquitted" of the dangerousness allegation at the first trial. *Id.* at 193, ¶ 28. For the same reasons, the jury's verdicts during the guilt phase of the trial did not acquit Scarpati of the dangerousness allegation, and therefore submitting that issue to the jury during the aggravation phase of the trial did not subject her to double jeopardy.

## II.     Sentencing Issues

**¶46**         Scarpati argues that the court erred in its determination of aggravating factors for sentencing purposes. "Whether a trial court may employ a given factor to aggravate a sentence presents a question of law we review *de novo*." *State v. Alvarez*, 205 Ariz. 110, 113, ¶ 6 (App. 2003).

**¶47**         Before sentencing, Ernest Johnson, a longtime acquaintance of Scarpati's, submitted a letter of support referencing Scarpati's newfound commitment to "sobriety" in the aftermath of the fatal collision. In his sentencing memorandum, defense counsel similarly asserted that Scarpati "voluntarily completed an alcohol awareness and treatment program at her own expense and for her own benefit," and she "has been active in Alcoholics Anonymous" ever since the collision. Acknowledging that another DUI charge was pending against Scarpati in Pinal County, defense counsel asserted that Scarpati "vehemently denies" the allegations in that case and that, in any event, the pending charge alleges impairment by marijuana, not alcohol. Defense counsel further wrote of Scarpati's exposure to alcohol abuse and domestic violence as a child, identifying her "very dysfunctional" upbringing in a home "where both parents drank too much alcohol" as a mitigating factor.

**¶48**         In her remarks at the sentencing hearing, however, Scarpati's friend Celeste Rodriguez stated, "[t]o be clear, [Scarpati] does not have an alcohol or drug problem." Scarpati's son Antonio likewise denied that she is an alcoholic, insisting that in his "whole life" he has never seen his mother "drink excessively."

¶49 The prosecutor took issue with these statements, insisting that Scarpati "is an alcoholic, whether people want to admit that or not." The prosecutor then warned that Scarpati's alcoholism makes her a risk to reoffend upon her release from prison. "Being in prison," the prosecutor stated, is "not going to cure alcoholism," and when Scarpati "gets out, she will face that temptation."

¶50 The court found, as mitigating factors, Scarpati's "difficult upbringing and childhood," her "family support" and "community support," and her "prior physical health challenges," an apparent reference to Scarpati's near-fatal bout with cancer several years earlier. The court also found that, "[f]or the most part, [Scarpati] has been a productive member of society despite challenges that she faced."

¶51 The court then went on to find that Scarpati is an alcoholic and that her alcoholism is a mitigating factor, stating,

> And the Court also finds, as the case law allows me to do, to find her addiction to alcohol and other substances, which I do find that she is an addict or also known as an alcoholic. But I do find that to be mitigating.

¶52 The court then found aggravating factors, noting that

> the first one, of course, is the use of a dangerous instrument, which is the vehicle. And that's what that car was. It wasn't a gun, it wasn't a knife, it wasn't a hammer, it was the car. And that is a dangerous instrument the way that it was used to cause death or serious physical injury.

The court went on to find, as additional aggravating factors, the commission of "[m]ultiple offenses," that one of the victims was a minor, and the "emotional harm" to Robert and to Patricia's next of kin. The court then stated:

> There are additional aggravators beyond those found by the jury, and that's the defendant's history of DUIs. Although no felonies, there is a long disturbing history. And the sad thing based on the history is set forth—everyone see[s] how damaging alcohol abuse can be. . . . And so while I can find her addiction to alcohol and perhaps other drugs can be a mitigating factor, *I can also find it as an aggravating factor because I think it makes her a danger to the community, that addiction.*

15

(Emphasis added.) The court added that, despite her childhood exposure to the "destructive" effects of "alcohol addiction," Scarpati "unfortunately . . . seems to have embraced abusing alcohol" instead of "eradicating the demon she saw as a child between her parents."

¶53        In her opening brief on appeal, Scarpati argues that the sentencing court erred in considering the existence of "multiple victims" and a "minor victim" as aggravating factors because, she contends, she "did not target multiple victims or a minor victim." She further argues that the court erred in considering her use of a dangerous instrument as a sentencing aggravator because the jury's finding of dangerousness already put her in an enhanced sentencing range under A.R.S. § 13-704.

¶54        After briefing was complete, this Court *sua sponte* ordered supplemental briefing on whether the sentencing court erred in finding Scarpati's alcoholism to be an aggravating factor. In her supplemental briefing, Scarpati argues that the court's finding of her addiction to be an aggravating factor was contrary to longstanding case law "recogniz[ing] the unconstitutionality of penalizing a person simply for their status of addiction." The State denies that the court considered Scarpati's addiction as an aggravating factor, asserting that the court "only considered [Scarpati's] addiction in conjunction with" her "history of DUIs."

¶55        A sentencing court may properly consider, as aggravating factors, the existence of "multiple victims," *State v. Tschilar*, 200 Ariz. 427, 435-36, ¶ 34 (App. 2001), and the fact that a victim is a minor, *State v. Emedi*, 251 Ariz. 78, 85, ¶ 27 (App. 2021). Scarpati has cited, and we are aware of, no authority for the proposition that the number and ages of the victims cannot be considered at sentencing absent a showing of the defendant's specific intent to "target" multiple or minor victims. We therefore reject Scarpati's claim that the court erred in considering "multiple victims" and "a minor victim" as aggravating factors.

¶56        We agree with Scarpati, however, on her remaining claims. Because the jury's determination of dangerousness put Scarpati in an enhanced sentencing range under A.R.S. § 13-704, the court erred in identifying Scarpati's use of a dangerous instrument as a sentencing aggravator. *See* A.R.S. § 13-701(D)(2) (providing that "the court shall consider" a defendant's "[u]se, threatened use or possession of a deadly weapon or dangerous instrument during the commission of the crime" as an aggravating circumstance "*except* if this circumstance . . . has been utilized to enhance the range of punishment under section 13-704") (emphasis added).

¶57        Likewise, Scarpati's alcohol addiction cannot be considered as an aggravating factor because due process prohibits the State from punishing a person for being an addict. *See Robinson v. California*, 370 U.S. 660, 660, 667 (1962) (striking down statute "mak[ing] it a criminal offense for a person to 'be addicted to the use of narcotics,'" reasoning that "addiction is an illness," and "a state law which imprisons a person thus afflicted as a criminal . . . inflicts a cruel and unusual punishment in violation of the Fourteenth Amendment").

¶58        Although our dissenting colleague interprets the court's remarks at sentencing to refer to Scarpati's "conduct resulting from her addiction, *i.e.*, driving drunk," rather than her addiction itself, *see infra* ¶ 67, we do not interpret the court's statements in this manner. The court's comment about Scarpati having "embraced abusing alcohol" instead of "eradicating the demon she saw as a child" is, in our view, a clear reference to Scarpati's status as an alcoholic rather than her behavior on specific occasions. Moreover, the court's statement that "while I can find her addiction to alcohol . . . [to] be a mitigating factor, I can also find it as an aggravating factor because . . . it makes her a danger to the community" belies the contention that the court used the term "addiction" simply to refer to past instances of Scarpati's driving while impaired. By considering Scarpati's addiction as an aggravating factor when imposing her sentence, the court ran afoul of due process principles. *See Robinson*, 370 U.S. at 667; *Gregg v. Georgia*, 428 U.S. 153, 172 (1976) (citing *Robinson* for the proposition that courts cannot constitutionally "impose any punishment at all for the mere status of addiction").

¶59        The State argues, and our dissenting colleague agrees, that even if the sentencing court considered improper aggravating factors, Scarpati is entitled to no relief because she has not established fundamental, prejudicial error. Relying on *State v. Munninger*, 213 Ariz. 393 (App. 2006), the State argues that relief should be denied where, as here, "it is clear that an aggravated sentence would have been imposed even if the improper aggravator had not been used." *Id.* at 397, ¶ 12.

¶60        In *Munninger*, this Court denied relief to a defendant who was sentenced to an aggravated term of incarceration even though the sentencing judge improperly considered the defendant's use of a dangerous instrument as one of three aggravating factors (with the other two being harm to the victim and the viciousness of the crime). *Id.* at 395, 397, ¶¶ 3, 12. In so holding, the Court noted that "[t]he sentencing judge explicitly found that each of the aggravating factors alone would outweigh the mitigating

factors." *Id.* at 397, ¶ 12 (cleaned up). Because the court made no similar finding here, *Munninger* is inapposite.

¶61       Instead, *State v. Trujillo*, 227 Ariz. 314 (App. 2011), is on point. In *Trujillo*, this Court reversed Trujillo's aggravated prison sentences after concluding that "[t]he trial court's references" at sentencing "to Trujillo's failure to admit responsibility and lack of remorse" indicated that the court's sentencing decision was improperly "influenced by" an improper aggravating factor, *i.e.*, Trujillo's exercise of his constitutional right against self-incrimination. *Id.* at 317, 319, ¶¶ 12, 20-21. The State argued that Trujillo's sentence should be affirmed despite the sentencing court's error on the basis that "Trujillo cannot demonstrate prejudice merely by speculating that he would have received a lesser sentence absent the error." *Id.* at 318, ¶ 17. Rejecting the State's argument, the Court noted that "[t]he trial court's references to Trujillo's failure to admit responsibility and lack of remorse were not mere passing comments." *Id.* at 319, ¶ 20. Finding that "the record plainly indicates that the trial court's sentencing decision was influenced by Trujillo's failure to admit guilt and his lack of remorse," this Court concluded that "a reasonable likelihood exists that a sentencing judge, without consideration of those factors, could have imposed sentences more favorable to Trujillo." *Id.* at ¶ 21.

¶62       Here, the court's repeated references to Scarpati's addiction at the sentencing hearing were no "mere passing comments." *See id.* at ¶ 20. On the contrary, Scarpati's alcoholism was the subject of considerable discussion and disagreement among the participants at the hearing, a disagreement that the court resolved when it stated, "I do find that she is an addict or also known as an alcoholic." Just as the sentencing court's repeated references to improper aggravating factors led the *Trujillo* court to reject the State's argument that Trujillo had failed to establish prejudice, the extensive focus on Scarpati's alcoholism at her sentencing hearing, and the court's express reference to "that addiction" as "an aggravating factor" because "it makes her a danger to the community," refutes the contention that Scarpati's addiction had no effect on the court's sentencing decision.

¶63       Because the court's improper consideration of Scarpati's addiction as an aggravating factor requires us to vacate her sentences, we need not address whether the court's reference to Scarpati's use of a dangerous instrument as an aggravating factor, though error, was harmless. Instead, we vacate Scarpati's sentences and remand for resentencing without the consideration of improper aggravators.

**CONCLUSION**

¶64      We affirm Scarpati's convictions, vacate her sentences, and remand for resentencing.

**P E R K I N S, J.**, concurring in part and dissenting in part:

¶65      Concluding that the superior court judge's discussion about Scarpati's addiction amounted to punishing her for her addiction requires willful disregard for the context of that discussion. I therefore respectfully depart from the majority's conclusion that the court improperly aggravated Scarpati's sentence because of her addiction. And even if I could blind myself to the context of the court's statements, I disagree that such an error was prejudicial under these circumstances.

¶66      I concur with this decision insofar as it affirms Scarpati's convictions, and I agree with the majority that the court did not err in considering "multiple victims" and "a minor victim" as aggravating sentencing factors.

¶67      At sentencing, while discussing Scarpati's DUI history, the superior court judge stated, "while I can find [Scarpati's] addiction to alcohol and perhaps other drugs can be a mitigating factor, I can also find it as an aggravating factor because I think it makes her a danger to the community, that addiction." Having already concluded that addiction constituted a mitigating factor, the judge here—by the plain words she spoke—noted that *the consequences* of Scarpati's addiction countered the power of any mitigation. In other words, the judge simply noted that Scarpati's *conduct resulting from her addiction*, *i.e.*, driving drunk, posed a danger to the community.

¶68      There is a critical distinction between punishing a person for her status as an addict and punishing her for engaging in conduct resulting from her status. The former violates *Robinson* and the latter is permissible. *See Powell v. Texas*, 392 U.S. 514, 532 (1968) (distinguishing *Robinson v. California* when criminal penalty is applied "for public behavior which may create substantial health and safety hazards, both for appellant and for members of the general public" rather than for status as an addict).

¶69      The judge here never explicitly found either the addiction alone or Scarpati's resulting conduct to be an aggravating factor; rather she

noted that she "can also find" Scarpati's history of endangering the community through impaired driving to be an aggravator. The context of the judge's comments informs her meaning: multiple witnesses at sentencing confirmed the presentence report information that, despite causing the death of another person, Scarpati thereafter received another DUI charge that remained pending, and thus she apparently continued to drive impaired after the collision. The judge did not impermissibly aggravate Scarpati's sentence based on her addiction; at most, she appropriately considered the danger Scarpati's conduct continued to pose to the community. Viewing the judge's statements as the majority does requires both ignoring their context and setting aside our presumption that trial judges know the law and apply it when making decisions. *State v. Trostle*, 191 Ariz. 4, 22 (1997) (quoting *Walton v. Arizona*, 497 U.S. 639, 653 (1990)).

¶70        Even if I excise the context and conclude the judge applied an erroneous aggravator, Scarpati has not established prejudice. We apply fundamental error review when a criminal defendant fails to object in superior court. *State v. Henderson*, 210 Ariz. 561, 567, ¶ 19 (2005). A defendant must show a fundamental error exists and prejudice caused by the error to warrant relief. *Id.* at ¶ 20. And so Scarpati must show that not enough aggravating factors remained to support a slightly aggravated sentence. *See id.* at 569–70, ¶¶ 28–32 (holding aggravation error is not prejudicial if at least two aggravators remain without error to sustain a super-aggravated sentence). In *State v. Munninger*, 213 Ariz. 393 (App. 2006), this Court denied relief to a defendant sentenced under an improper aggravator because other aggravators existed at sentencing and the sentence was still "within the aggravated range prescribed for his offense." *Id.* at 397, ¶ 12.

¶71        The majority argues *Munninger* does not apply because in that case the superior court judge explicitly stated "that each of the aggravating factors alone would outweigh the mitigating factors." *Id.* But the court in *Munninger* also explained that "[b]efore *Henderson*, [in a prior opinion in the same case, *State v. Munninger*, 209 Ariz. 473 (App. 2005)] the standard was whether we were certain this sentence would be the same absent the improper factor." *Munninger*, 213 Ariz. at 397, ¶ 14. And our supreme court in *Henderson* clarified "that the burden is on the defendant to demonstrate prejudice." *Id.* Thus, *Munninger* and *Henderson* tell us that the decisional pivot point is not whether the judge explicitly stated that any aggravating factor would alone outweigh a mitigating factor, but rather whether the defendant has demonstrated prejudice.

¶72      Here, both the judge and jury found multiple aggravators including a minor victim, multiple victims, emotional harm, and the defendant's history of DUIs. And the court slightly aggravated the sentence from the presumptive 10.5 years to 12 years. Even if the court erred in (1) applying the dangerous instrument factor for both enhancement and aggravation, and (2) considering addiction as an aggravating factor, neither error was prejudicial. The remaining aggravators the court identified are more than enough to support a slightly aggravated sentence.

¶73      The majority also argues that this case should be resentenced because in *State v. Harrison*, 195 Ariz. 1 (1999), the court ordered resentencing when the judge imposed an aggravated sentence without clearly articulating the basis for doing so. *Id.* at 5, ¶ 15. There, the judge's comments at sentencing "amounted to a lecture or scolding" and it was not possible "to discern from [the] sentencing transcript what else the trial judge may have considered as an aggravating circumstance." *Id.* In contrast, the court here identified multiple, specific aggravators that the jury found and that it explicitly considered in slightly aggravating Scarpati's sentence.

¶74      The majority's reliance on *State v. Trujillo* is also unpersuasive. As the majority acknowledges, the superior court judge in that case repeatedly ("no less than five times") commented on an improper consideration. *State v. Trujillo*, 227 Ariz. 314, 319, ¶ 20 (App. 2011). The concern was the extent of the court's own improper commentary. Here, the majority imputes to the court the extensive witness testimony taking contradictory positions on addiction and then relies on that imputed testimony to apply *Trujillo* in finding prejudice. The "considerable discussion at the hearing" by witnesses cannot suffice to establish prejudice when the judge here made only a single reference to Scarpati's addiction-related conduct in discussing aggravation. This is not a *Trujillo* case.

¶75      The superior court judge imposed a slightly aggravated sentence based on statutory and other appropriate aggravating factors. The record supports the sentence, and I would affirm the sentences.

